6 F.3d 1028
 62 USLW 2195, 17 Employee Benefits Cas. 1201
 William J. ELMORE; Wayne Comer, Individually and as
representatives of a class of Plaintiffs similarly
situated, Plaintiffs-Appellees,
v.
CONE MILLS CORPORATION; Cone Mills Acquisition Corporation;
Dewey L. Trogdon; Lacy G. Baynes, Defendants-Appellants,
and
Paul W. Stephanz; Wachovia Bank and Trust Company, N.A.,
Defendants (Three Cases).
William J. ELMORE; Wayne Comer, Individually and as
representatives of a class of Plaintiffs similarly
situated, Plaintiffs-Appellants,
v.
CONE MILLS CORPORATION; Cone Mills Acquisition Corporation;
Dewey L. Trogdon; Lacy G. Baynes, Defendants-Appellees,
and
Paul W. Stephanz; Wachovia Bank and Trust Company, N.A., Defendants.
 Nos. 92-1362, 92-1363, 92-1404 and 92-1482.
 United States Court of Appeals,
Fourth Circuit.
 Argued Sept. 29, 1992.
Decided Sept. 22, 1993.
Rehearing In Banc Granted, Opinion Vacated Dec. 13, 1993.
 
 John Robbins Wester, Robinson, Bradshaw & Hinson, P.A., Charlotte, NC, argued (David C. Wright, III, Robinson, Bradshaw & Hinson, P.A., Charlotte, NC, Robert O. King, Kristofer K. Strasser, Ogletree, Deakins, Nash, Smoak & Stewart, Greenville, SC, Robert J. Lawing, Jane C. Jackson, Robinson, Maready, Lawing & Comerford, Winston-Salem, NC, on brief), for defendants-appellants.
 John P. Freeman, Columbia, SC, argued (James R. Gilreath, J. Kendall Few, Greenville, SC, on brief), for plaintiffs-appellees.
 Before MURNAGHAN and WILLIAMS, Circuit Judges, and SPROUSE, Senior Circuit Judge.
 OPINION
 WILLIAMS, Circuit Judge:
 
 
 1
 In these cross-appeals the primary issue we must decide is whether representations by an employer made prior to the adoption of an Employee Stock Ownership Plan, but not incorporated into the formal plan documents, are enforceable against the employer. We conclude that such representations are not enforceable under the Employee Retirement Income Security Act (ERISA), 29 U.S.C.A. Secs. 1001-1461 (West 1985 & Supp.1993), and reverse the district court's findings and conclusions to the contrary. We affirm, however, the district court's conclusions that the employer was not liable for any delay in appointing a plan fiduciary, that the employer did not make an enforceable promise to maintain a certain level of pension benefits, that the employer did not overvalue the stock contributed to its pension plans, and that ERISA preempted the employees' state law contract and tort claims against the employer.
 
 I.
 INTRODUCTION
 A. Factual Background
 
 2
 In response to a hostile takeover bid announced on October 31, 1983, a group of senior management employees at Cone Mills Corporation decided to gain control of the company through a leveraged buy-out (LBO), which became final on March 27, 1984. While planning and implementing the LBO, Dewey Trogdon, Cone Mills's Chairman of the Board and Chief Executive Officer, communicated regularly with Cone Mills's employees through various letters, office memoranda, and video presentations. Many of these communications were addressed to concerns expressed by employees regarding the impact the LBO would have on their jobs, including the impact on their pension benefits. The recurring themes of these communications were that management would protect the interests of Cone Mills's employees and shareholders and would keep the employees informed of any changes occurring because of the LBO.
 
 
 3
 Prior to the LBO, Cone Mills maintained one employee pension plan for its hourly employees and three plans for its salaried employees: an Employees' Retirement Plan (ERP); a Supplemental Retirement Plan (SRP); and an Employee Stock Ownership Plan (PAYSOP).[1] Management proposed significant changes in these pension plans, primarily through the adoption of an Employee Stock Ownership Plan (the 1983 ESOP).[2] As proposed, the 1983 ESOP would provide Cone Mills's salaried and hourly employees with pension benefits through stock contributions.
 
 
 4
 In a December 12, 1983, letter to all Cone Mills employees, Trogdon stated that their "pension plans [would] be left in place with [their] existing benefits guaranteed by the Company," and that, through the coordination of the 1983 ESOP and the ERP, the employees could "receive no less than the full amount" of their pension benefits. (J.A. at 3695 (emphasis omitted).) This letter also noted that "[t]ogether, the ESOP and your pension plan are expected to provide greater financial security than your present retirement benefits."[3] (Id.) Trogdon estimated that over $50 million in stock could be contributed to the 1983 ESOP in the first two years but expressly noted that he could not legally guarantee that amount.
 
 
 5
 On December 15th, Trogdon sent a letter to Cone Mills's salaried employees. This letter explained that Cone Mills would keep in place the ERP, which would work in tandem with the 1983 ESOP. This letter also explained that the Company had over-funded the ERP, resulting in more funds being in the ERP accounts than were necessary to pay for accrued benefits (the pension reversion surplus),[4] and that
 
 
 6
 [i]f the management and bank proposal to buy the Company is successful, there is agreement among management and the banks that we will contribute the surplus, or its equivalent in Company stock, to the ESOP. When the transaction is executed and the contribution is made, you, I, and all other Cone employees will "take title" to a substantial asset in which we currently have no rights or ownership.
 
 
 7
 (J.A. at 3700.)[5] On page two of the letter, under the heading "General Comments," Trogdon specifically stated: "As we get more time, we will answer your questions and publish information to the extent that it can be done on a legal and factual basis. We are, however, giving you information now based on our present plans which are subject to revision to meet changing situations." (J.A. at 3701.) Based on this letter and the December 12th letter, Plaintiffs claim they are entitled to the pension reversion surplus (the surplus claim).
 
 
 8
 In video presentations and question-and-answer booklets distributed prior to finalization of the LBO, management reiterated that employees would receive retirement benefits at least comparable to their current pension plans. Management explained, however, that it was unable to guarantee the future value of each employee's 1983 ESOP account, that the plan could be amended at any time, and that the written plan documents, rather than other communications, would control the terms of the employees' actual benefits. The question-and-answer booklet further notified the employees in bold-faced type that "[t]he legal documents control, and if this material differs in any way from the legal documents, the correct source of the information is the legal documents." (J.A. at 3911.) In addition, a March 15, 1984, memorandum to salaried employees referred to the profit sharing potential of the 1983 ESOP, but made no guarantees of its success. Instead, management only guaranteed that "no employee would lose any of his retirement benefits" from the ERP and that the employees' pension benefits would not change because of the LBO. (J.A. at 4034.)The LBO was approved by a nearly unanimous vote of the shareholders on March 26, 1984, and all shares of common stock, including the shares held by the PAYSOP, were purchased for $70 per share.
 
 
 9
 The 1983 ESOP plan documents were not executed by Lacy Baynes[6] until April 2, 1984. The plan documents required the company to contribute stock worth ten percent of each covered employee's compensation for each of the first two years of the 1983 ESOP's operation and one percent of each employee's compensation for each year thereafter (the 10/10/1 formula). The executed documents, however, did not mention the surplus claim.
 
 
 10
 Between May and December of 1985, Cone Mills received the pension reversion surplus, which had increased in value to $69 million.[7] The district court found that from March 1984 through September 1985 Cone Mills contributed junior preferred stock valued at $54,796,638[8] to the 1983 ESOP. Consequently, the district court concluded that Defendants did not contribute the entire pension reversion surplus to the 1983 ESOP.[9] The district court found that "[f]or a majority of salaried employees, however, after 1984 the 1983 ESOP did not provide additional pension benefits at retirement." (J.A. at 363.) The failure to receive additional benefits and Cone Mills's failure to contribute the entire pension reversion surplus prompted this lawsuit.
 
 B. Procedural History
 
 11
 Initially, two former Cone Mills salaried employees filed suit against Cone Mills, Trogdon, and Baynes in South Carolina state court, alleging various state law causes of action relating to the surplus claim.[10] Defendants removed the case to federal district court because the pension plans at the heart of this dispute are controlled by ERISA, and Plaintiffs amended their complaint to assert causes of action under ERISA, Rules 10b-5 and 14a-9 of the Securities and Exchange Commission, 17 C.F.R. Secs. 240.10b-5 & 240.14a-9 (1992); Sec. 14(a) of the Securities and Exchange Act of 1934, 15 U.S.C. Sec. 78n (1988); and Sec. 1962 of the Racketeering Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. Sec. 1962 (1988). Upon Plaintiffs' motion, the district court certified a class of 1800 salaried employees who were participants in the SRP and employed by Cone Mills on February 23, 1984, the date Cone Mills distributed its proxy statement in connection with the LBO.
 
 
 12
 Defendants moved for summary judgment, arguing that Plaintiffs' state law claims were preempted under ERISA, that ERISA did not provide a remedy for representations made outside formal plan documents, and that Plaintiffs' claims were insufficient as a matter of law. The district court held that ERISA preempted Plaintiffs' state law claims with the exception of the state law securities claim and granted summary judgment for Defendants on Plaintiffs' Rule 10b-5 and RICO claims. The court denied Defendants' motion for summary judgment with respect to Plaintiffs' ERISA claims and their claims for proxy violations under state and federal law.
 
 
 13
 After a bench trial on the remaining issues, the district court found that Plaintiffs were entitled to have the entire pension reversion surplus contributed to the 1983 ESOP, but were not entitled to recover on Defendants' other alleged ERISA violations, including the failure to appoint a plan fiduciary until April 2, 1984, the contribution of Cone Mills stock to the 1983 ESOP that was worth less than the company claimed, and the failure to provide Cone Mills's employees with benefits under the post-LBO pension plans at least comparable to an amount they would have received under the pre-LBO plans. The district court also ruled for Defendants on the securities law claims.
 
 
 14
 In their appeal, Defendants challenge the district court's finding that Plaintiffs can recover under the surplus claim, and Plaintiffs cross-appeal the district court's ruling for Defendants on the other remaining ERISA claims and on the preemption of Plaintiffs' state law contract and tort causes of action; they do not appeal the judgment for Defendants on the securities claim. We first address Defendants' claims on appeal and then turn to Plaintiffs' cross-appeal.
 
 II.
 DEFENDANTS' CLAIMS ON APPEAL
 
 15
 The district court held that Plaintiffs were entitled to the portion of the pension reversion surplus that Cone Mills did not contribute to the 1983 ESOP. The court found that the surplus claim was part of the 1983 ESOP plan and was enforceable under ERISA. As a result, the district court held that Defendants' breached their fiduciary duty to Plaintiffs when they failed to contribute the entire pension reversion surplus to the 1983 ESOP. In the alternative, and subject to Plaintiffs proving detrimental reliance on the surplus claim, the district court held that Plaintiffs: (1) had satisfied all of the elements of their claim for equitable estoppel; and (2) were entitled to recover as third-party beneficiaries of a contract between Defendants and their banks which required Defendants to contribute the pension reversion surplus to the 1983 ESOP.[11] We address each argument in turn.
 
 A. Breach of Fiduciary Duty
 
 16
 ERISA imposes certain duties upon plan fiduciaries, breaches of which are actionable by any plan participant. 29 U.S.C.A. Secs. 1104, 1109(a), 1132(a)(2). The district court concluded that the Defendants, as plan fiduciaries, breached their duties to carry out the responsibilities of their offices solely in the interest of the plan participants " 'for the exclusive purpose of ... providing benefits to participants ... in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title or Title IV.' " (J.A. at 369 (emphasis omitted) (quoting 29 U.S.C.A. 1104(a)(1)).) The district court's conclusion was based on its determination that the governing "documents" and "instruments" of the 1983 ESOP included the surplus claim because it constituted a clear and unambiguous promise of benefits that was formal, authorized, and ratified. The district court reasoned, therefore, that ERISA's fiduciary duty principles required Defendants to provide benefits in accordance with the surplus claim as part of the plan documents.[12]
 
 
 17
 The district court erred in determining that the surplus claim is part of the 1983 ESOP plan. Under ERISA, plan fiduciaries must provide benefits only "in accordance with the documents and instruments governing" the employee pension benefit plan. 29 U.S.C.A. Sec. 1104(a)(1)(D) (emphasis added); see also Dzinglski v. Weirton Steel Corp., 875 F.2d 1075, 1080 (4th Cir.) ("To adhere to the plan is not a breach of fiduciary duty."), cert. denied, 493 U.S. 919, 110 S.Ct. 281, 107 L.Ed.2d 261 (1989). It is undisputed that the surplus claim was not incorporated into the written terms of the 1983 ESOP plan documents adopted by Defendants on April 2, 1984. Instead, the actual plan documents only mandate that Cone Mills provide benefits under the 10/10/1 formula.
 
 
 18
 Nonetheless, the district court found that an employer representation not contained in the formal plan documents could become a part of the plan if the promise to provide benefits was contained in a written, formal, authorized, and ratified statement sent by the employer's CEO to all of the employer's salaried employees.[13] In reaching its conclusion, the district court applied the inverse logic of our holding in Pizlo v. Bethlehem Steel Corp., 884 F.2d 116 (4th Cir.1989). In Pizlo, we held that a plaintiff does not have a cause of action for benefits under ERISA when such benefits were promised in informal and unauthorized amendments to the benefit plan. Id. at 120. We did not state, however, that employees are entitled to recover benefits under any written statement made by a company official, even if authorized and ratified.[14] On the contrary, only promised benefits adopted in accordance with the amendment procedures outlined in the formal plan documents will suffice to incorporate the promised benefits into the plan. Miller v. Coastal Corp., 978 F.2d 622, 624 (10th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 1586, 123 L.Ed.2d 152 (1993). Under the formal plan documents of the 1983 ESOP, no amendment is effective unless the Cone Mills Board of Directors executes a written document containing the amendment, the document is delivered to the plan trustee, and the trustee endorses receipt of the amendment. Even though the Cone Mills Board of Directors ratified Trogdon's actions and communications with Cone Mills employees, there is no evidence in the record that any written terms regarding the surplus claim were ever delivered to Baynes as trustee or endorsed by him. Therefore, the surplus claim is not enforceable as a valid plan amendment to the 1983 ESOP.
 
 
 19
 Because the surplus claim is not enforceable under the 1983 ESOP either as initially adopted or as an amendment, Plaintiffs can only prevail if the proposed benefits are recoverable independent of the 1983 ESOP. Some courts have allowed employees to recover promised benefits that are not contained in a formal written plan document if the benefits are contained in an informal benefit plan. See, e.g., Donovan v. Dillingham, 688 F.2d 1367, 1372 (11th Cir.1982) (en banc). In Donovan, the Eleventh Circuit held that an informal ERISA plan has been established "if from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits." Id. at 1373. In addition, the informal plan must actually be in existence; the mere decision to create an employee benefit plan is not actionable. James v. National Business Sys., Inc., 924 F.2d 718, 720 (7th Cir.1991); Moeller v. Bertrang, 801 F.Supp. 291, 293 (D.S.D.1992). An informal plan may exist independent of, and in addition to, a formal plan as long as the informal plan meets all of the elements outlined in Donovan. See Henglein v. Informal Plan for Plant Shutdown Benefits for Salaried Employees, 974 F.2d 391, 400 (3d Cir.1992) (absence of integration clause in a formal plan and distribution of informal documents may lead the court to find that an informal plan existed in addition to the formal plan).
 
 
 20
 Applying these criteria, the surplus claim does not constitute an informal plan existing independent of the 1983 ESOP. Although the first three Donovan elements (the intended class of beneficiaries, the intended benefits, and the source of the funding) are ascertainable from the December 12th and 15th letters, these letters do not satisfy the fourth element (the procedure for receiving benefits). The only way an employee could ascertain the procedures for obtaining benefits would be to refer to the 1983 ESOP formal plan document, which was not adopted until April 2, 1984. Therefore, we agree with the district court that the letters from Trogdon which are the basis of the surplus claim cannot constitute an informal ERISA plan that entitles Plaintiffs to benefits in lieu of or in addition to the 10/10/1 mandatory contributions contained in the 1983 ESOP.[15] Our conclusion that Plaintiffs are not entitled to any relief under the Donovan analysis is supported by the Ninth Circuit's decision in Carver v. Westinghouse Hanford Co., 951 F.2d 1083 (9th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 3036, 120 L.Ed.2d 905 (1992). In Carver, several independent companies that operated separate pension plans for their employees were consolidated into one company (WHC) by the Department of Energy (DOE). Id. at 1085. WHC sent the employees of the various companies booklets stating that it would create a new pension plan and would use a particular formula to calculate each participant's length of service. Id. After the individuals accepted employment with the consolidated company, however, the company finalized the plans for the new pension program using a different formula for calculating years of service. Id. at 1086. The employees filed suit alleging that the promises contained in the booklets created an informal plan under Donovan. Id.
 
 
 21
 The Ninth Circuit found that the employees had not established the existence of an informal plan under the Donovan analysis because Donovan and its progeny only apply when the surrounding circumstances demonstrate the creation of a de facto pension plan. Id. WHC, in contrast, actually adopted the plan that was discussed in the booklets, albeit with different terms than originally anticipated. The booklets sent to employees prior to the adoption of the formal plan merely "apprise[d] anxious employees of what they might expect once the transition from several employers to WHC was completed. WHC had not completed its negotiations with DOE, and consequently, had not adopted" the plan in the booklets. Id. at 1087. The court also noted that the intent to create a plan is not enough to create liability on the part of the employer:
 
 
 22
 WHC should have explained in its communications that the plan was not formalized and was subject to DOE approval. Failure to do so, however, did not elevate the newsletters and the preliminary summary booklet to the level of an informal plan in June, 1987. The plan simply was not a reality until that December when it was formally adopted.
 
 
 23
 Id. The same analysis applies in this case. Trogdon sent the letters in question in an attempt to keep Cone Mills's employees apprised of the proposed developments in their pension plans. Furthermore, unlike WHC, Cone Mills specifically informed their employees that these plans were subject to change. In this context, Cone Mills's December 12th and 15th letters were merely preliminary statements of its intentions regarding the plan and do not constitute an enforceable plan. See id. Therefore, because the letters were neither a part of the 1983 ESOP nor created an enforceable informal employee benefit plan, we reverse the district court's conclusion that Defendants had a fiduciary duty to abide by them.[16]
 
 B. Equitable Estoppel
 
 24
 Because we conclude that the district court incorrectly held that the surplus claim was a part of the 1983 ESOP, we must review the district court's alternative determination that Plaintiffs may be able to recover the pension reversion surplus on an equitable estoppel theory under federal common law.
 
 
 25
 Since the district court rendered its decision, this court has issued two relevant opinions. In Singer v. Black & Decker Corp., 964 F.2d 1449, 1452 (4th Cir.1992), we held that "resort to federal common law generally is inappropriate when its application would conflict with the statutory provisions of ERISA, discourage employers from implementing plans governed by ERISA, or threaten to override the explicit terms of an established ERISA benefit plan." This is so becauseERISA demands adherence to the written terms of an employee benefit plan.... Federal common law does not provide a backdoor through which these statutory requirements may be evaded, and attempts to import state common law principles such as equitable or promissory estoppel to alter and undermine written obligations have been consistently rebuffed by the courts.
 
 
 26
 Id. at 1453-54 (Wilkinson, J., concurring).
 
 
 27
 In Coleman v. Nationwide Life Insurance Co., 969 F.2d 54, 60 (4th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 1051, 122 L.Ed.2d 359 (1993), we held that estoppel principles cannot be used to effect a modification of an ERISA benefit plan. Adoption of an estoppel theory
 
 
 28
 would require this court to rewrite the contract of insurance. While a court should be hesitant to depart from the written terms of a contract under any circumstances, it is particularly inappropriate in a case involving ERISA, which places great emphasis upon adherence to the written provisions in an employee benefit plan. Plaintiff's theories, though packaged in different wrappers, all would lead to the same result--the written plan would no longer be the benchmark in an action under ERISA.
 
 
 29
 Id. at 56.
 
 
 30
 While the dissent correctly points out that Singer involved an attempt to require an employer to amend a pension plan for one group of employees in the same manner as it had done for another group of employees, 964 F.2d at 1451, and Coleman involved an attempt to receive welfare benefits based on an oral post-plan promise made by an unauthorized individual, 969 F.2d at 57, we believe the concerns expressed in those cases apply equally to written pre-plan promises made by an authorized company official regarding pension plans. If pre-plan statements concerning the proposed terms of a soon-to-be adopted plan were enforced, then "the written plan would no longer be the benchmark in an action under ERISA," Coleman, 969 F.2d at 56, employers would no longer know what their obligations were under their benefit plans, and employees would be harmed when the actuarial soundness of the employee benefit plans was destroyed by groups of employees claiming benefits for which no contributions were made, see Black v. TIC Inv. Corp., 900 F.2d 112, 115 (7th Cir.1990). Therefore, we hold that equitable estoppel is not an available theory to enforce pre-plan statements regarding benefits proposed under an ERISA plan and reverse the district court's conclusion to the contrary.[17]C. Third-Party Beneficiary
 
 
 31
 The district court also held that, should this court determine that the surplus claim was not a part of the 1983 ESOP, Plaintiffs could proceed as third-party beneficiaries under a breach of contract theory. Specifically, the district court found that Plaintiffs were third-party beneficiaries of a contract between Cone Mills and the banks providing financing for the LBO and noted its intent to allow Plaintiffs to recover under this contract if they could prove reliance thereon. Because we hold that a third-party beneficiary cause of action cannot be used to modify an employer's obligations under its ERISA plan, we reverse the district court's conclusion to the contrary.
 
 
 32
 There is nothing in ERISA that specifically authorizes participants to file suit for benefits under a third-party beneficiary breach of contract theory. As we have previously stated, however:
 
 
 33
 ERISA does not contain a body of contract law to govern the interpretation and enforcement of employee benefit plans. Instead, Congress intended for the courts, borrowing from state law where appropriate, and guided by the policies expressed in ERISA and other federal labor laws, to fashion a body of federal common law to govern ERISA suits.
 
 
 34
 Holland v. Burlington Indus., Inc., 772 F.2d 1140, 1147 n. 5 (4th Cir.1985) (quoting Scott v. Gulf Oil Corp., 754 F.2d 1499, 1501-02 (9th Cir.1985)), aff'd sub nom. Brooks v. Burlington Indus., Inc., 477 U.S. 901, 106 S.Ct. 3267, 91 L.Ed.2d 559 (1986). Therefore, Plaintiffs' claim can only succeed under a third-party beneficiary theory if we adopt this theory as part of the federal common law applied in ERISA suits.
 
 
 35
 The guiding principle in fashioning federal common law in ERISA cases is that the common law must be consistent with the purposes of ERISA. See Provident Life & Accident Co. v. Waller, 906 F.2d 985, 992 (4th Cir.), cert. denied, 498 U.S. 982, 111 S.Ct. 512, 112 L.Ed.2d 524 (1990). We agree with the holding of the Fifth Circuit that the "creation of a federal common law of unjust enrichment and third-party beneficiary claims would be inconsistent with ERISA's terms and policies." Morales v. Pan Am. Life Ins. Co., 914 F.2d 83, 87 (5th Cir.1990).
 
 
 36
 In addition, "resort to federal common law generally is inappropriate when its application would ... threaten to override the explicit terms of an established ERISA benefit plan." Singer, 964 F.2d at 1452. Allowing recovery under a third-party beneficiary breach of contract theory would do just that. The effect of enforcing the alleged contract between Cone Mills and the banks would be to require Cone Mills to make an additional contribution over the 10/10/1 required contribution, even though the formally adopted plan documents specifically provide that all other contributions are completely discretionary. Therefore, we decline to incorporate a third-party beneficiary breach of contract theory into the federal common law governing ERISA suits.
 
 III.
 PLAINTIFFS' CLAIMS ON APPEAL
 A. Preemption
 
 37
 Plaintiffs argue that if ERISA will not permit a cause of action for the enforcement of the surplus claim, then ERISA does not preempt Plaintiffs' state law causes of action. ERISA specifically provides that it preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" covered by ERISA. 29 U.S.C.A. Sec. 1144(a). In interpreting Sec. 1144(a), the Supreme Court has held that ERISA's preemption provision is to be construed broadly, such that a law "relates to" an employee benefit plan "if it has a connection with or reference to such a plan." Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 96-97, 103 S.Ct. 2890, 2900, 77 L.Ed.2d 490 (1983).
 
 
 38
 Plaintiffs assert state law claims for breach of contract, fraud, unjust enrichment, breach of fiduciary duty, negligence, accounting, and conspiracy in an attempt to enforce promises made in connection with the 1983 ESOP, which is undeniably an ERISA-covered employee benefit plan. Because all of these claims clearly "relate to" an ERISA-covered plan, we affirm the district court's conclusion that these state law causes of action are preempted.
 
 B. Stock Valuation
 
 39
 Plaintiffs also contend that the stock contributed to the 1983 ESOP is overvalued, creating a deficiency in the 1983 ESOP accounts which Cone Mills is required to rectify. Specifically, Plaintiffs claim that the stock is not worth the $100 per share reported in an appraisal performed by Cone Mills's accountant. The district court rejected this claim, finding that Plaintiffs failed to carry their burden of establishing that the stock was overvalued. On appeal, Plaintiffs contend that the district court erroneously shifted the burden of proof to them and that the evidence established that the stock was overvalued.
 
 
 40
 We find as an initial matter that the district court correctly allocated the burden of proof. Plaintiffs bear the burden of proof with respect to each element of every cause of action, including damages. Aeronca, Inc. v. Style-Crafters, Inc., 546 F.2d 1094, 1096 (4th Cir.1976). Furthermore, Plaintiffs' acknowledgement of their burden on this issue during trial waived their challenge to its allocation on appeal.[18] We also find that the district court thoroughly evaluated the reports submitted by both sides. We cannot say that its determination that Cone Mills's expert had adequately appraised the stock was clearly erroneous, see Fed.R.Civ.P. 52(a), and we therefore affirm the district court's determination.
 
 
 41
 C. Promise of Greater Benefits under Post-LBO Plans
 
 
 42
 Plaintiffs also argue that Defendants should be liable under ERISA because the benefits provided under the 1983 ESOP were not greater than the benefits they would have received if the pre-LBO benefit plans had remained in effect after the LBO. Plaintiffs base this claim on the December 12th and March 15th letters, video presentations, and a question-and-answer booklet which promised Plaintiffs that they could not lose any of their benefits under the post-LBO plans and that they would most likely receive even greater benefits because of the profit sharing potential of the 1983 ESOP. As the district court correctly noted, these statements were not included in the 1983 ESOP plan documents. Therefore, under the analysis employed in section II of this opinion, Plaintiffs are not entitled to recover for any failure to abide by these alleged commitments.
 
 D. Delay in Appointment of a Trustee
 
 43
 Finally, Plaintiffs contend that the district court erred in dismissing their cause of action for breach of fiduciary duty based on Cone Mills's failure to appoint a trustee for the 1983 ESOP upon the creation of the plan in December 1983. The district court reasoned that even if Plaintiffs could bring a cause of action on this basis, they suffered no damage as a result of the delayed appointment. We agree with the district court.
 
 
 44
 ERISA requires an employer to appoint a plan fiduciary or trustee. 29 U.S.C.A. Sec. 1102(a)(1) (the benefit plan "shall provide for one or more named fiduciaries who jointly or severally shall have authority to control and manage the operation and administration of the plan"). In this case, Plaintiffs allege that Cone Mills established the 1983 ESOP in December of 1983 when the Board of Directors adopted a Detailed Plan Description, but failed to appoint a trustee until Baynes assumed that role on April 2, 1984. Thus, according to Plaintiffs, Cone Mills breached its fiduciary duty to its employees by operating the 1983 ESOP for a short time without a named fiduciary.
 
 
 45
 Plaintiffs' analysis is flawed for two reasons. First, there was no delay in appointing a plan fiduciary. Cone Mills did not adopt the 1983 ESOP in December 1983. At that time, Cone Mills had not finalized all of the plans for the 1983 ESOP and only adopted the plan description, which contained terms that were materially different from the terms of the 1983 ESOP plan documents. It was not until April 2, 1984, that Cone Mills formally adopted the 1983 ESOP, and on the same day Cone Mills appointed Baynes as the plan fiduciary. Second, even if the plan had been adopted in December 1983, Cone Mills did not make any contributions to the 1983 ESOP until June 1984. Until that time, there was no corpus of the 1983 ESOP trust for a fiduciary to manage or administer. Therefore, we question whether Plaintiffs could have suffered any damages by Cone Mills's failure to appoint a plan fiduciary or trustee immediately. The district court correctly ruled for Cone Mills on this claim.
 
 IV.
 CONCLUSION
 
 46
 For the reasons discussed above, we affirm the district court's determinations in favor of Defendants on the value of the contributed stock, the promise to maintain pre-LBO benefits, the preemption issue, and the claim for delay in appointing a plan fiduciary. We reverse the district court's determination that Defendants are liable under the surplus claim.
 
 
 47
 AFFIRMED IN PART, REVERSED IN PART.
 
 MURNAGHAN, Circuit Judge, dissenting:
 I.
 
 48
 Soon after learning of a bid by an outside entity to take over Cone Mills Corporation, the Board of Directors of Cone Mills met to evaluate the alternatives available to the company. Of the alternatives considered, the preferred option was a leveraged buy-out (LBO) by the management. Chairman Trogdon and other senior executive management presented to the Board an offer to acquire all outstanding shares of common stock in Cone Mills, subject to the arrangement of satisfactory financing, government approval, and approval by Cone Mill's shareholders.
 
 
 49
 As could be expected, news of the hostile bid proposal and the possible LBO by management created concern among the employees about their job security, their pension benefits, and the future of the company. To still the disquiet and keep the employees informed, Cone Mills, through Chairman Trogdon, communicated with its employees--by letter, newsletter, and video presentation--about various changes that would be made in their employee benefit plans if the LBO was approved. Trogdon repeatedly assured Cone Mills's employees and shareholders that management would protect their interests and keep them informed of any changes that would occur.
 
 
 50
 One of the changes contemplated by management in the course of implementing the LBO was the revision of three preexisting pension plans and the adoption of an Employee Stock Ownership Plan (the 1983 ESOP). On December 12, 1983, Trogdon wrote a letter to all Cone Mills employees, assuring employees that their benefits under the existing pension plan (ERP) would be kept in place, and that under the new structure, "you can receive no less than the full amount of your pension benefits." The letter went on to say that "subject to legal and tax rulings, it appears that in the first two years (1984-85), over fifty million dollars of stock could be contributed to your ESOP."
 
 
 51
 Two days later Trogdon wrote another letter, addressed to salaried employees only, assuring them that the company's ERP would be kept in place and would operate in tandem with the new 1983 ESOP.
 
 
 52
 The letter informed the employees that the ERP was over-funded, and that if the LBO went through, management planned to contribute the surplus or its equivalent in company stock to the ESOP. Indeed, the letter told the employees that there was an "agreement among management, and the banks," that, if the LBO was approved, the surplus from the ERP or its equivalent in company stock would be contributed to the ESOP. "When the transaction is executed and the contribution is made, you, I, and all other Cone employees will 'take title' to a substantial asset in which we currently have no rights or ownership."
 
 
 53
 On March 26, 1984, Cone Mills shareholders approved the management LBO by a nearly unanimous vote. Ninety-nine percent of Cone Mills' salaried employees voted for the LBO. Salaried employees owned 71,582 shares, or 1.3% of Cone Mills common stock, and the management group controlled 288,532, or 5.23%.
 
 
 54
 Not until April 2, 1984 did management execute the 1983 ESOP plan documents. The executed documents made no mention of the promised contribution to the ESOP of the pension reversion surplus or its equivalent. The documents laid out a formula for contribution to the fund whereby Cone Mills would contribute stock to the fund on the basis of a "10/10/1 formula." The surplus reversion of the pension fund, when collected by Cone Mills, totaled $69 million. Cone Mills paid $54.8 million of this amount into the ESOP, or $14.2 million less than the full amount of the surplus.
 
 II.
 
 55
 The majority opinion has taken care to outline the reasons why the plaintiff class has no cause of action under the terms of ERISA to enforce the representations made by Cone Mills to its employees regarding the pension reversion surplus. Building upon the basic tenet of ERISA that employee benefits plans should be reduced to written instruments, the majority reasons that any promise not contained in a written plan document need not be enforced under ERISA. It points out that the 1983 ESOP plan documents were not executed until April 2, 1984--well after the letters promising that the surplus would be contributed to the 1983 ESOP--and as adopted, did not mention the surplus. Instead, the official plan documents adopted a "10/10/1 formula" for contribution to the ESOP, which it has scrupulously followed. Thus, according to the majority, the defendants had no fiduciary duty to honor the pension reversion surplus promise and in fact were prohibited from honoring it because of their fiduciary duty to adhere to the official plan documents. But see Fischer v. Philadelphia Elec. Co., 994 F.2d 130 (3rd Cir.1993) (ERISA's fiduciary standards do not permit a plan administrator to make affirmative material misrepresentations to plan participants about changes that are being considered in its employee benefits plan).
 
 
 56
 The majority supports its argument that the pension reversion surplus promise may not be enforced by extending the rule in Pizlo v. Bethlehem Steel Corp., 884 F.2d 116 (4th Cir.1989), to the instant facts. In Pizlo, we held that existing, written plan documents may not be modified by oral or informal and unauthorized amendments. Pizlo, 884 F.2d at 120. See also Nachwalter v. Christie, 805 F.2d 956, 960 (11th Cir.1986); Moore v. Metropolitan Life Insurance Co., 856 F.2d 488, 489 (2nd Cir.1988); Alday v. Container Corp. of America, 906 F.2d 660, 665 (11th Cir.1990). The purpose of the Pizlo rule against informal amendments is to provide certainty in the provision of benefits to employees. Without a rule requiring adherence to the written formal document, employees would be unable to ascertain with certainty their benefits, individual employees might receive benefits intended to benefit employees as a group, and employers might be discouraged from informing their employees about proposed changes or new plans.
 
 
 57
 The majority extends the Pizlo rule to preclude the enforcement of any and all extra-plan promises made to employees, including promises formally extended by authorized company officials in written form. It construes the rule that ERISA fiduciaries have no obligation to fulfill promises not contained in a written plan to apply even where no written plan exists at the time the promises are made.
 
 
 58
 Yet there is some irrationality in applying the same rule that prohibits enforcement of a promise extended after the adoption of plan documents to promises made prior to the adoption of the official plan documents, especially when the pre-plan promise pertains to what employees can expect when the proposed plan takes effect. Application of the Pizlo rule assumes an existing, available for inspection, formal plan, and charges employer and employee with the duty to compare its terms with those of the promise. The instant circumstances differ in a most significant respect: there was no existing plan with which the promise made could be compared. The ability of the employees to ascertain their benefits and act accordingly was thus frustrated. The rule announced in Pizlo against informal modifications of an extant written plan has vitality in the circumstances where a plan document exists at the time of the promise. But here it is clear that Trogdon's letters did not modify or amend or contradict an existing plan document; rather, they made false promises to employees about a proposed new plan that failed to make good on the promise when, months later, it finally came into existence.
 
 
 59
 After reversing the district court and holding that the employer had no fiduciary duty to fulfill the pension reversion surplus promise, the majority goes even further and rejects the district court's holding that the employees may enforce the promise on an equitable estoppel or third party beneficiary contract theory.[1] The majority holds, in other words, that ERISA's coverage is not broad enough to prohibit the misrepresentation concerning the proposed benefits plan because only a formal written plan may be referred to when ascertaining fiduciary duties, but is so exclusive that it preempts any state common law actions and even precludes the court from applying common law principles to provide equitable relief.
 
 
 60
 However, it seems to me that the authority the majority relies upon to reject the use of common law equitable and contract theories is distinguishable. None of the cases cited deal with a situation similar to the one we here encounter--an employer materially misleading plan participants about the terms of the plan to be adopted and thereby securing good will, employee stability and their desired votes for the leveraged buy-out. Instead, the cases cited by the majority deal with an attempt by employees to hold employers to extra-plan benefits promises made after a plan was adopted. See, e.g., Singer v. Black & Decker Corp., 964 F.2d 1449 (4th Cir.1992) (employees sought enhanced early retirement benefits not provided for in the existing benefits plan, based on the contention that offers by the company of a limited special retirement program that temporarily operated to amend the existing plan constituted an implied representation that similar benefits would be offered in the future); Coleman v. Nationwide Life Ins. Co., 969 F.2d 54 (4th Cir.1992) (plaintiff sought benefits under group health insurance plan where company personnel had represented to her that she was covered, when in fact her eligibility had automatically terminated under the terms of the written plan), cert. denied, --- U.S. ----, 113 S.Ct. 1051, 122 L.Ed.2d 359 (1993).
 
 
 61
 I am loath to conclude that a company may, with impunity, make representations to its employees about a benefits plan--with the implicit purpose of assuring employees that their benefits will be enhanced if a proposed leveraged buy-out is successful--and then renege on those promises when the LBO is effectuated and the plan is adopted. The majority's approach allows (and perhaps invites) employers to make promises to employees about a plan still in gestation thereby eliciting desired behavior, and then disavow those promises and hide behind the protection of a written plan which does not incorporate the promises made. Such a result would make a mockery of the most fundamental canon of the ERISA statutory scheme--that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries," and shall exercise those duties with "the care, skill, prudence, and diligence" of a "prudent man acting in like capacity." 29 U.S.C. Sec. 1104. See Massachusetts Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 157, 105 S.Ct. 3085, 3098, 87 L.Ed.2d 96 (1985) ("[C]ourts must always bear in mind the ultimate consideration whether allowance or disallowance of such relief would better effectuate the underlying purposes of ERISA--enforcement of strict fiduciary standards of care in the administration of all aspects of pension plans and promotion of the best interest of participants and beneficiaries.") (Brennan, J., concurring); see also Berlin v. Michigan Bell Telephone Co., 858 F.2d 1154, 1163 (6th Cir.1988) (rejecting the view that any communications or representations made prior to a decision to adopt a plan are nonfiduciary); Fischer, 994 F.2d at 133-135 (allegations that employer breached fiduciary duty by knowingly or negligently making material misrepresentations regarding a change to a plan during period when change was under serious consideration stated a claim that could not be dismissed on summary judgment). Moreover, as explained below, the statute itself, and our own Fourth Circuit precedent indicate that this court would be well within the discretion granted to it by the Congress under the ERISA statute in providing equitable relief to the employers by looking to common law estoppel or contract theories.[2]
 
 III.
 
 62
 Besides granting federal courts the power to enjoin any act that violates a provision of ERISA or the terms of a benefits plan, ERISA specifically permits federal courts to grant "other appropriate equitable relief." See 29 U.S.C. Sec. 1132(a)(3)(B). We have recently recognized that, in enacting ERISA, Congress "intended that the courts would develop a federal common law of rights and obligations under ERISA-regulated plans." Singer v. Black & Decker Corp., 964 F.2d 1449, 1452 (4th Cir.1992) (quoting Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989)) (quotations and internal citations omitted). See also Holland v. Burlington Indus. Inc., 772 F.2d 1140, 1147 n. 5 (4th Cir.1985) (Congress intended for courts to borrow from state law when appropriate in fashioning federal common law to govern ERISA), aff'd sub nom Brooks v. Burlington Indus. Inc., 477 U.S. 901, 106 S.Ct. 3267, 91 L.Ed.2d 559 and cert. denied sub nom. Slack v. Burlington Indus., Inc., 477 U.S. 903, 106 S.Ct. 3271, 91 L.Ed.2d 562 (1986). In Singer, we acknowledged the difficulty courts may encounter in delineating the situations where federal common law would be a "desirable companion to ERISA," from those where it would unduly expand rights and remedies established by the statutory scheme. But we also admonished the district court for "paint[ing] with too broad a brush in stating categorically that courts should not look to state common-law causes of action that have been preempted by ERISA in fashioning federal common law." Singer, 964 F.2d at 1452. Indeed, the Singer court defended the use by a federal court of common law doctrines "to assist in shaping the federal common law of ERISA," by noting that use of common law doctrines "to further[ ] the goals of ERISA" would advance, not frustrate, the intention of Congress that ERISA subject plans and plan sponsors to a uniform body of benefits law. Id. at 1452-53. An obvious source for federal common law would be existing state common law applicable in analogous situations. Id.
 
 
 63
 In developing a federal common law of rights and obligations under ERISA-regulated plans, courts must be cautious. The doctrines of equitable or promissory estoppel or third party beneficiary or unilateral contract theory should not be used to alter the terms of established benefits plans or to undermine the purposes of the federal statutory scheme. See id. at 1453-54 (Wilkinson, J. concurring). We recently determined in Coleman, 969 F.2d 54, that estoppel principles could not be used to enforce an informal statement to an employee that contradicted an explicit term of the extant benefit plan. In Coleman, the plaintiff argued that her employer was estopped from denying her requested medical benefits because it had verbally represented to her that she was still covered by the policy when, in fact, by the terms of the plan, her coverage had been automatically terminated. The court denied relief, noting that "[u]se of estoppel principles to effect a modification of a written employee benefit plan would conflict with 'ERISA's emphatic preference for written agreements.' " Coleman, 969 F.2d at 58 (quoting Degan v. Ford Motor Co., 869 F.2d 889, 895 (5th Cir.1989)).
 
 
 64
 The Coleman rule is a sound one. Equitable estoppel should not be employed to give force to unauthorized, oral promises that contradict the written terms of an established plan. I do not, however, agree with the majority that Coleman and Singer preclude the application of estoppel theory in the instant case. Neither case involved a scenario similar to the one we here encounter. In particular, neither case, it seems to me, instructs us to deny equitable relief where no plan exists when a promise is made and relied upon, and the promise pertains to what the contemplated plan would provide.
 
 
 65
 I also disagree with the majority's conclusion that our prior precedent precludes the employees from going forward on a third-party beneficiary theory, or indeed upon a theory of unilateral contract. No case within our circuit has held that the application of common law contract principles is inappropriate in every circumstance. On the contrary, in Provident Life & Acc. Ins. Co. v. Waller, 906 F.2d 985 (4th Cir.1990), we explicitly concluded that "fashioning a federal common law rule of unjust enrichment" was appropriate "in the circumstances of this case." Id. at 993. In making that determination, the Provident Life court looked to the "plan contract itself, the statutory policies of ERISA, and state law," and decided that the enrichment doctrine would further the clear intent of the plan, was consistent with the statutory provisions of ERISA, and would "fit the archetypal unjust enrichment scenario." Id. at 992-93.
 
 
 66
 My reading of Provident Life, Singer, and Coleman leads me to conclude that they do not prohibit the application of common law principles such as estoppel, third-party beneficiary, or unilateral contract theory in ERISA cases, but rather counsel caution in the use of those doctrines. Other circuits are in accord. See, e.g., Fischer, 994 F.2d at 136 (permitting plaintiffs to proceed on their claim under ERISA on theory of equitable estoppel where employees retired in reliance upon a misrepresentation by employer that a retirement 'sweetener' was not being considered for adoption); Kane v. Aetna Life Ins., 893 F.2d 1283 (11th Cir.1990) (holding that although estoppel may not be invoked to amend, modify, enlarge, or extend coverage, it may be used to hold insurer to its agent's representations regarding the interpretation of an ambiguous plan provision), cert. denied, 498 U.S. 890, 111 S.Ct. 232, 112 L.Ed.2d 192 (1990); Cleary v. Graphic Communications Int'l Union, 841 F.2d 444, 447-49 (1st Cir.1988) (recognizing the applicability of estoppel principles, but holding that informal representations of the plan administrator did not constitute a representation that benefits would be paid); Haeberle v. Board of Trustees, 624 F.2d 1132, 1139 (2nd Cir.1980) (recognizing the applicability of estoppel to ERISA actions, but requiring strict proof of its elements). Happily, Singer provides several principles that "have emerged as guides for the courts in demarking those situations in which the development of federal common law is inappropriate," and, by extension, those situations in which the use of common law principles are warranted. Singer, 964 F.2d at 1452. Singer indicates that it is appropriate to apply federal common law when the application will not run counter to the policies of ERISA or the terms of an extant written plan:
 
 
 67
 Importantly, courts must be conscientious to fashion federal common law only when it is necessary to effectuate the purposes of ERISA. Thus, resort to federal common law generally is inappropriate when its application would conflict with the statutory provisions of ERISA, discourage employers from implementing plans governed by ERISA, or threaten to override the explicit terms of an established ERISA benefit plan. And, courts should remain circumspect to utilize federal common law to address issues that bear at most a tangential relationship to the purposes of ERISA.
 
 
 68
 Id. (internal quotations and citations omitted).
 
 A.
 
 69
 In applying Singer's principles to the instant case, we must first determine whether, in this case, estoppel, unilateral contract, or third party contract theory would conflict with the statutory provisions of ERISA. According to the majority, application of estoppel theory to enforce the pre-plan promises made by Trogdon would undermine the ERISA provision that employee benefits plans be established and administered pursuant to a written plan, see 20 U.S.C. Sec. 1102(a)(1), and the subsequent conclusion that the written plan be the sole benchmark in an ERISA action. See Coleman, 969 F.2d at 59.
 
 
 70
 The majority's emphasis on adherence to the written plan documents as its justification for ignoring any and all employer promises regarding prospective plans is unwarranted. The rationale apparently derives from language in Coleman and the concurring opinion in Singer, both of which were concerned with extant written plans. Coleman referred to ERISA's "emphatic preference" for written agreements, and Singer stated that ERISA "demands adherence" to the written terms of an employee benefit plan. See Coleman, 969 F.2d at 58; Singer, 964 F.2d at 1453 (Wilkinson, J. concurring). ERISA does indeed indicate a preference for written plans. But the preference does not constitute a strict statutory prerequisite for coverage under the act. ERISA does not insist on a written plan when the promise of bringing it about is still in gestation. The preference for written plans over oral promises has been gleaned from Secs. 1102(a)(1) and (b)(3) of the ERISA statute, which provide, in pertinent part, that "[e]very employee benefit plan shall be established and maintained pursuant to a written instrument ... [and shall] (3) provide a procedure for amending such plan ..." These provisions, however, are merely directives to plan administrators and fiduciaries of plans covered by ERISA:
 
 
 71
 ERISA does not, however, require a formal, written plan.... There is no requirement of a formal written plan in either ERISA's coverage section ERISA Sec. 4(a), 29 U.S.C. Sec. 1003(a), or its definitions section, ERISA Sec. 3(1), 29 U.S.C. Sec. 1002(1). Once it is determined that ERISA covers a plan, the Act's fiduciary and reporting provisions do require the plan to be established pursuant to a written instrument, ERISA Secs. 102 and 402, 29 U.S.C. Secs. 1022 and 1102; but clearly these are only the responsibilities of administrators ... and are not prerequisites to coverage under the Act.
 
 
 72
 Donovan, 688 F.2d at 1372. See also Scott v. Gulf Oil, 754 F.2d 1499, 1503 (9th Cir.1985). Clearly, the fiduciary strictures of ERISA are as applicable to benefits "plans" that are, through breach of promise, not formally adopted or not accurately reduced to written documents as they are to formally adopted written plans. See Donovan, 688 F.2d at 1372. Thus the written plan does not play such an exalted role in the statutory scheme that its mere subsequent existence and a fiduciary's adherence to its terms provide an excuse for permitting serious prior misrepresentations on the part of the fiduciary.
 
 
 73
 Similarly, the conclusion derived from the preference for written plans--that informal modifications of established plans are unenforceable--does not necessarily lead to the conclusion that promises that relate to benefits plans and are made prior to official adoption of a plan may never be enforced. The fact that a written plan is eventually adopted does not cure the previous misrepresentation, especially if employees have already acted in reliance upon the misrepresentation. The later adopted plan cannot, in practical terms, operate retroactively to provide timely notice to the employees of the discrepancy between the promise and the plan. Why, then, should eventual adoption of a plan protect the company against charges that it materially misled its employees or breached a unilateral contract for which consideration was given?
 
 
 74
 In sum, the rule that estoppel, unilateral contract, or third party contract principles should not be used when they conflict with the ERISA preference for written contracts or violate the edict against informal modification of established plans does not prevent their application under the facts of the instant case. The more pertinent inquiry, as I see it, is whether, given the peculiarities of the instant case, the application of estoppel or contract principles might be "necessary to effectuate the purposes of ERISA." Provident Life, 906 F.2d at 992 (quoting U.S. Steel Mining Co. v. District 17, United Mine Workers of America, 897 F.2d 149, 153 (4th Cir.1990)).
 
 
 75
 A review of cases discussing the policies and purposes of the ERISA statutory scheme reveals several recurring themes. ERISA was enacted, first and foremost, to protect employees and to secure promised benefits. ERISA aspires to preserve the financial integrity of plan funds for the benefit of equitable distribution to all plan participants; it favors a uniform body of federal law applicable to all employee benefits plans; it seeks to avoid confusion over the terms of benefits plans by compelling fiduciaries to establish and maintain plans pursuant to one official written document; it endorses full disclosure to plan participants; and it holds plan fiduciaries to the highest standards of care in the management of employee benefits plans. See, e.g., Donovan v. Dillingham, 688 F.2d 1367, 1372 ("the policy of ERISA is to safeguard the well-being and security of working men and women and to apprise them of their rights and obligations under any employee benefit plan"); Coleman, 969 F.2d at 60 ("ERISA is designed 'to promote the interests of employees and their beneficiaries in employee benefits plans' "); Pohl v. Nat'l Benefits Consultants, Inc., 956 F.2d 126, 128 (7th Cir.1992) ("one of ERISA's purposes is to protect the financial integrity of pension and welfare plans"); Provident Life, 906 F.2d at 993 (ERISA "indicates a desire to ensure that plan funds are administered equitably and that no one party, not even plan beneficiaries, should unjustly profit"); Cleary, 841 F.2d at 447 n. 5 (pension fund stability is of major concern, given the strong policy in ERISA of protecting plan funds for the sake of employee participants); Haeberle, 624 F.2d at 1139 (ERISA provisions that establish standards of fiduciary responsibility, require reporting and disclosure to employees of current information that affect rights, and mandate a written plan naming fiduciaries, are "clearly designed to protect pension funds from improper and improvident acts by those entrusted with responsibility for their investment"); Massachusetts Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 157, 105 S.Ct. 3085, 3098, 87 L.Ed.2d 96 (1985) (the underlying purposes of ERISA are "enforcement of strict fiduciary standards of care in the administration of all aspects of pension plans and promotion of the best interest of participants and beneficiaries") (Brennan, J. concurring).
 
 
 76
 Holding a company to its written promises about the terms of a soon-to-be-adopted ESOP plan, especially when the promises are made during a time when employee goodwill and favorable voting attitudes are of utmost importance to and sought by the company, seems to me to further the goals of the statutory scheme. Enforcement of a pre-plan promise concerning a proposed plan would not contravene it, it not yet being in existence. Such enforcement would be consistent with the directive that plan administrators be held to strict fiduciary standards and consonant with ERISA's mandate that employers fully disclose information to its employees in succinct, correct, and easy to understand terms. Such enforcement would also further, rather than frustrate, the goal of clarity over what statements about plan terms rule. If companies may, with impunity, make promises about expected plan terms and then ignore them when the documents themselves are drawn up, confusion on the part of the employees is bound to result. If, on the other hand, a company is held to its formal pre-plan relied-upon promises or pre-plan promises for which consideration has been given, it is less likely to misrepresent its intentions. Its pre-plan statements will be in conformity with the formal plan documents and no confusion need ensue. Finally, the use of estoppel, unilateral contract, or third party beneficiary doctrine to enforce the promise to contribute the pension reversion surplus into the 1983 ESOP would not favor any individual plan participants to the detriment of the participants as a group and would threaten no damage to, but would rather enhance the financial integrity or stability of the fund since the assets paid to employees will come from outside the plan.
 
 B.
 
 77
 In addition to the mandate that the use of common law doctrines in ERISA actions effectuate rather than obstruct the policies and provisions of the statute, Singer directs courts to investigate whether the use of a common law theory to enforce an extra-plan promise would "threaten to override the explicit terms of an established ERISA benefit plan." Singer, 964 F.2d at 1452. Here, of course, there was no "established ERISA benefit plan" at the time the pension reversion surplus promise was made or when the vote took place. The chronology of events was critical. The fact that Cone Mills eventually did adopt a plan that did not contain the promise did not transform the pre-plan misrepresentation into a "threat to the explicit terms" of the later adopted plan. Rather, the failure of Cone Mills to honor its pre-plan promise by contributing the surplus money to the fund laid bare the earlier misrepresentation. Moreover, the plan document itself, as finally adopted, does not by its terms bar Cone Mills from honoring its earlier promise. The "10/10/1" contribution formula formally adopted may be read as merely a guarantee of a minimum contribution to the fund which could easily be supplemented by the pension reversion surplus contribution without alteration, amendment or threat to the terms of the 1983 ESOP plan.
 
 
 78
 Coleman does not mandate a different conclusion. The promise in Coleman was a statement assuring an employee that she was covered under a group health insurance plan, when in fact, by the terms of the established plan, she was not. Enforcement of that extra-plan statement would indeed have threatened an explicit term of the extant written plan document which was crucial to maintaining the financial stability of the fund and the equitable distribution of the benefits. Any payments made to Coleman would necessarily have depleted the fund to the detriment of those participants who were covered by the plan's terms. The pre-plan promise in the instant case does not in any way threaten the ESOP fund itself, or the rights of the plan participants as a whole, for the surplus contribution at issue will be contributed to the fund as a whole from a source outside the fund. Accordingly, I conclude that the use of estoppel or contract principles to enforce the pension reversion promise, made well before the plan documents came into formal existence, would not threaten the terms of the 1983 ESOP plan.
 
 C.
 
 79
 Singer also cautions that common law principles should not be applied where their application would discourage employers from implementing benefits plans. There are myriad variables that weigh in an employer's calculation of whether to provide pension and benefits plans. Equitable relief granted on the facts of the instant case is hardly likely to be a significant factor. There may be some legitimate concern that a rule holding plan administrators to promises about a plan made before the plan itself is officially adopted will discourage employers from communicating with employees about the plan. Truthful communications about prospective plans are, obviously, to be encouraged. However, communications that are misleading, unreliable, unrealistic, or premature, and which, furthermore, extract reliance or a performance by employees, should, just as obviously, be discouraged. Under ERISA the duty of administrators and employers to be forthright and honest in whatever communications they have with present or future plan participants, at all stages of the development of the plan, is paramount.[3]IV.
 
 
 80
 It is a fact of modern life that employees make a variety of employment, personal, and financial decisions based upon the expectations they hold with regard to their benefits plans. Here, it appears that they went further, and supported an LBO on the basis of their expectations. It is not unreasonable to suspect that a management group in the position of Cone Mills--threatened by a hostile takeover, scrambling to save the company and their jobs, anxious to stabilize the workforce and keep employees calm and assured--may be inclined to be less than completely responsible in communications to employees if such irresponsibility is permitted by the courts. I would affirm the determination of the district court that the common law theories of equitable estoppel and third party contract are viable theories under the circumstances of the case. I would remand to allow investigation not only of the elements of one or both of those two legal concepts but would permit, if the employees chose to pursue it, the doctrine of unilateral contract.
 
 
 81
 I respectfully dissent.
 
 
 
 [1]
 The PAYSOP gave ownership rights in the company through profit sharing contributions of Cone Mills's common stock. At the time of the LBO, the PAYSOP owned 1.3% of Cone Mills's common stock
 
 
 [2]
 Under management's proposed changes to the pension plans, the ERP fiduciary would actuarially determine the value of each employee's ERP benefits accruing through December 31, 1983, and would use the funds in each individual's ERP account to purchase an annuity that would cover those benefits. The amount remaining in the ERP accounts after the annuities were purchased would constitute a pension reversion surplus, which, under the terms of the ERP, Cone Mills would be entitled to retain
 Plan participants in the ERP would continue to accrue benefits under the ERP after December 31, 1983, but Cone Mills would not continue to make contributions to the ERP accounts. Instead, the value of a salaried employee's 1983 ESOP account would be used to satisfy his ERP benefits accruing after 1983. If the amount in an employee's 1983 ESOP account was insufficient to meet this obligation, Cone Mills would be required to make an additional contribution to the individual's ERP. If the employee's 1983 ESOP account exceeded his ERP obligations, however, the employee would receive the excess.
 
 
 [3]
 The December 12, 1983, letter, along with statements made in a video presentation, a question-and-answer booklet, and a March 15, 1984, letter, form the basis for Plaintiffs' claim that they are entitled to receive benefits under the post-LBO plans at least comparable to the amount they would have received under the pre-LBO plans. See discussion infra part III.C
 
 
 [4]
 The surplus was created when the assets of the ERP accounts exceeded the actuarially determined present value of pension benefits accrued by employee participants. The funds remaining in the accounts after Cone Mills purchased annuities to pay for the accrued benefits became the pension surplus reversion alluded to in the December 12th and 15th letters
 
 
 [5]
 This statement formed the basis for Plaintiffs' claims as third party beneficiaries of a contract between Cone Mills and the bank. See discussion infra part II.C
 
 
 [6]
 Baynes was Cone Mills's Secretary and was the plan fiduciary for the 1983 ESOP from April 2, 1984, to June 20, 1984
 
 
 [7]
 In the December 1983 letters, management had estimated that the pension reversion surplus would be approximately $50 million. Because the reversion created taxable income, Cone Mills deferred receipt until 1985 so that it could reclaim 1981 taxes paid in excess of $17 million. This intentional delay in receiving the pension reversion surplus increased its value from the original estimate of $50 million to the $69 million received by December 1985
 
 
 [8]
 The district court found that Cone Mills made the following contributions: $36,023,000 on March 30, 1984; $3,948,815 on September 13, 1985; and $14,824,823 on September 15, 1985. These contributions did not coincide with Cone Mills's receipt of the pension reversion surplus. In comparison, Cone Mills received the pension reversion surplus over the following installments: $59,000,000 on May 20, 1985; $2,000,000 on September 27, 1985; $5,800,000 on December 6, 1985; and $2,200,000 on December 23, 1985
 
 
 [9]
 Plaintiffs also argued that the value of the junior preferred stock contributed to the 1983 ESOP was less than $54,796,638, thereby creating a larger contribution deficiency. The district court found, however, that Plaintiffs failed to meet their burden of proof on this issue. See discussion infra part III.B
 
 
 [10]
 Plaintiffs' state law claims included civil conspiracy, breach of contract, breach of fiduciary duty, breach of contract accompanied by fraudulent acts, misrepresentation, unjust enrichment, and violation of state securities laws. Plaintiffs also sought an accounting
 
 
 [11]
 The district court noted its intention to allow Plaintiffs to proceed on these two alternative theories should we determine that Defendants had not breached their fiduciary duties. The district court certified its conclusions on these issues for interlocutory appeal pursuant to 28 U.S.C. Sec. 1292(b) (1988)
 
 
 [12]
 The district court found that Defendants violated three fiduciary duties: (1) the duty to act in accordance with the documents and instruments governing the plan; (2) the duty to discharge the responsibilities of their offices for the exclusive benefit of the plan participants; and (3) the duty not to engage in certain prohibited transactions. All three of these findings, however, first require a determination that the surplus claim was a part of the 1983 ESOP
 
 
 [13]
 The district court found that the surplus claim was ratified on May 15, 1984, at the annual Board of Directors meeting during which the Directors passed a general resolution ratifying all actions taken by the company's officers and directors on the company's behalf during the preceding year and another resolution that generally ratified all actions taken by Trogdon with respect to the company's benefit plans
 
 
 [14]
 The dissent suggests that extending the rule in Pizlo to promises made before the adoption of the official plan documents is somewhat irrational. See Dissenting Op. at 1041. The thread of the dissent's argument is that any promises made before the adoption of the plan documents would have been enforceable under principles of contract law, and thus, under our decision, the adoption of the 1983 ESOP divested Plaintiffs of vested contract rights. We disagree. The statements concerned proposed employee pension benefits and as such are statements of an employer's intent to create an "employee pension benefit plan," as defined in ERISA. 29 U.S.C.A. Sec. 1002(2)(A) ("employee pension benefit plan" includes any plan, fund, or program established by an employer to provide retirement income to employees or to result in a deferral of income by employees for periods extending to or beyond an employee's termination). ERISA, therefore, is the governing law, and would have been the governing law even if the 1983 ESOP had never been adopted. Id. Sec. 1003(a)(1) (ERISA covers all employee benefit plans established by an employer engaged in interstate commerce); Biggers v. Wittek Indus., 4 F.3d 291, 295-96 (4th Cir.1993) (company's promise to provide a severance arrangement for an individual employee could only be enforced, if at all, under ERISA and not under state contract law). As explained hereafter in this opinion, the statements involved would not have been enforceable either under ERISA's fiduciary duty provisions or under the federal common law doctrines advanced by Plaintiffs
 
 
 [15]
 Under the dissent's view, however, both the surplus claim and the 10/10/1 formula should be enforced. See Dissenting Op. at 1046. This approach may present difficulty in determining damages. If Cone Mills was required to contribute the entire surplus reversion in addition to the 10/10/1 formula contributions, then the district court's method of determining the surplus deficiency (comparing the total amount of contributions made by Cone Mills with the total amount of surplus reversion received by the company) was inadequate and the calculation of damages must be remanded. The district court should subtract the amount of money required to be contributed under the 10/10/1 formula from the total amount of contributions made by Cone Mills. The resulting figure then should be subtracted from the total amount of surplus received by Cone Mills to determine the actual surplus contribution deficiency. If, however, the dissent would allow the surplus reversion to be used to satisfy the 10/10/1 formula obligation, then the district court may be required to determine over what time frame the surplus should have been contributed. If there is no time limit on when the surplus must be contributed, then it is possible that Plaintiffs are not entitled to the remainder of the surplus at this time, but that Cone Mills is entitled to retain the money to make future contributions
 Another issue that should be considered under the dissent's view is whether the district court abused its discretion in denying prejudgment interest. See Quesinberry v. Life Ins. Co., 987 F.2d 1017, 1031 (4th Cir.1993). Specifically, this court would need to decide whether an award of prejudgment interest is required to compensate them for the loss of use of money wrongfully diverted from the 1983 ESOP, see Brink v. DaLesio, 667 F.2d 420, 429 (4th Cir.1981) (reversing district court order denying pre-judgment interest because the failure to award prejudgment interest allowed a plan fiduciary to profit from his breach of fiduciary duty and denied the plan participants full recovery), and the amount of the award based upon the date the surplus should have been contributed.
 
 
 [16]
 The dissent urges, however, that the Defendants' failure to contribute the surplus violated their fiduciary duty under 29 U.S.C.A. Sec. 1104(a)(1) to "discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries." See Dissenting Op. at 1041. This duty, however, only applies to actions taken by a plan fiduciary in accordance with his duty to administer the employee benefit plan; it does not apply to actions taken by an employer in creating the plan. See Belade v. ITT Corp., 909 F.2d 736, 738 (2d Cir.1990) (design of employee benefit plan is strictly a business decision and does not give rise to any fiduciary duties under ERISA); Dzinglski v. Weirton Steel Corp., 875 F.2d 1075, 1078 (4th Cir.) (" 'Congress left employers much discretion in designing their plans' under ERISA and in determining the level and conditions of benefits.") (quoting Hlinka v. Bethlehem Steel Corp., 863 F.2d 279, 283 (3d Cir.1988)), cert. denied, 493 U.S. 919, 110 S.Ct. 281, 107 L.Ed.2d 261 (1989). Cone Mills's actions with regard to announcing the proposed pension surplus reversion and deciding not to adopt that proposal are left to its sound business discretion and are not subject to the fiduciary duties imposed on plan administrators. In addition, the dissent's rationale would impose liability on Defendants for breach of fiduciary duties with respect to the 1983 ESOP when they were not plan fiduciaries. At the time the statements were made, the 1983 ESOP was not yet in existence. See Dzinglski, 875 F.2d at 1079-80 (an employer acting as a plan administrator has two roles--employer and plan administrator--but is only a fiduciary with respect to its actions as plan administrator)
 
 
 [17]
 The dissent expresses its concern that failure to enforce this promise under an equitable estoppel theory would encourage employer fraud. See Dissenting Op. at 1046. We share the dissent's concern with discouraging fraud and our holding is not that a plan participant is powerless against employer fraud with respect to an employee benefit plan. We simply do not believe that adoption of the common law principle of equitable estoppel is the appropriate course of action in response to this concern. Perhaps under the proper fact pattern a federal common law fraud theory could be incorporated into ERISA's statutory scheme. See Fischer v. Philadelphia Elec. Co., 994 F.2d 130, 133-35 (3d Cir.1993) (recognizing that employers may make business decision concerning the formation of an employee benefit plan without being subject to fiduciary duties, but may not make affirmative misrepresentations about their then-existing intentions during the formation stage). However, we need not reach that issue in this case because Plaintiffs did not argue a federal common law fraud theory in the district court. Moreover, the facts of this case do not demonstrate employer fraud, but merely that Cone Mills expressed its intentions regarding proposed plan terms. Such an expression of intended future business plans is not actionable unless the statement of intent was false when made. See Greenwood Mills, Inc. v. Russell Corp., 981 F.2d 148, 152 (4th Cir.1992) (statement of intended future business plans is not actionable as a misrepresentation unless statement of intent was false when made)
 In addition, while the dissent is of the view that the equitable relief sought in this case is not likely to be a significant factor in employers' decisions, see Dissenting Op. at 1047, we disagree. We believe that incorporating the broad common law principle of equitable estoppel into ERISA would discourage an employer from adopting employee benefit plans because of uncertainty about the potential extent of its liability. For the same reason, adopting the dissent's rationale may chill an employer from communicating with its employees about its intentions with regard to such plans. While we share the dissent's concern with encouraging truthful communications, there is no evidence that Cone Mills was untruthful regarding its intentions when the communications at issue were made. In addition, the record reflects that Cone Mills was careful in drafting the December letters to alert its employees that all plans were tentative and subject to change.
 
 
 [18]
 Even were we to believe that the issue was properly before this court, we would reach the same conclusion. Plaintiffs' argument that a plan fiduciary cannot acquire the employer's security unless it proves that it received adequate consideration is not applicable here. See 29 U.S.C.A. Secs. 1106(a)(1)(E), 1108(e). The rule cited by Plaintiffs does not apply when the employer's security is acquired by an eligible individual account plan, which includes the ESOP in question. 29 U.S.C.A. Sec. 1108(e)(3)(A)
 
 
 [1]
 The district court's finding with respect to the federal common law equitable and contract theories was a legal conclusion certified to this court for interlocutory appeal. The district court deferred receiving testimony on the issue of reliance, an element of both theories, until after the interlocutory appeal. Affirmance of the district court's legal conclusion that the employees could recover on the basis of these two theories would necessitate a remand for findings of fact on the issue of reliance
 
 
 [2]
 For purposes of reviewing the legal conclusion reached by the district court that "equitable estoppel and third-party beneficiary theories apply to this case," I assume, without deciding, that employees could prove the elements necessary to succeed on those theories. We are not in the position to make any such determination, since the district court deferred receiving testimony on the issue of reliance. However, the facts also present to me the possibility of the employees prevailing upon a theory of unilateral contract, i.e., when A makes a promise to be fulfilled upon B's performance of an act, B's performance binds A to the promise. The employees' performance--their support and votes for the LBO--was in response to a promise that the pension surplus would be contributed to the proposed 1983 ESOP, and so constituted the consideration necessary to bind Cone Mills to its promise
 
 
 [3]
 In footnote 14, the majority takes issue with my suggestion that the surplus contribution promise should be enforced according to principles of contract law, adopted into the federal common law of ERISA. The majority asserts that ERISA principles preempt the application of contract theory because the promise was one made "concerning an employee pension benefit plan." See Majority Opinion at page 1034 n. 14. The majority then goes on to suggest in footnote 16 that the fiduciary standards mandated by ERISA do not apply to the surplus contribution promise because those duties "only appl[y] to actions taken by a plan fiduciary in accordance with his duty to administer the employee benefit plan," and, at the time of the promise, no plan had yet been adopted. See Majority Opinion at page 1036 n. 16. The majority thus tries to have it both ways. I accept that the promise was one concerning an employee benefits plan, and that thus state common law claims are preempted. However, I cannot accept the proposition that, when an employer (during formulation of the plan) makes a promise that "concerns an employee benefits plan," and the employees change their position because of that promise, that the promise and breach thereof are not "actions taken by a plan fiduciary in accordance with his duty to administer the employee benefit plan." See Fischer v. Philadelphia Elec. Co., 994 F.2d 130, 133-35 (3rd Cir.1993) (fiduciary standards of ERISA do not allow employer to make affirmative misrepresentations about its intentions as regards a benefit plan during the formation stage of the plan); Berlin v. Michigan Bell Telephone Co., 858 F.2d 1154 (6th Cir.1988) (employer breached fiduciary duty under ERISA by misleading employees into believing that no early retirement would be adopted when in fact a plan was being seriously considered)
 The majority goes on to contend that design of a benefit plan is strictly a business decision left to the discretion of employers. See Majority Opinion at 1036 n. 16, citing Belade v. ITT Corp., 909 F.2d 736, 738 (2nd Cir.1990). Again, while that statement may be assumed to be correct, I do not believe that the freedom ERISA grants employers during formulation stages to design and adopt a plan translates into the freedom to make a promise to employees about a plan, and then renege on it after the employees have relied upon the promise and changed their position. Perhaps it is true, as the majority contends, that Cone Mills, when it made the promise, was not intentionally misrepresenting its plans, and that thus its actions do not amount to fraud. But its change of mind about the surplus after the employees relied on the promise and supported the LBO is certainly not performance of a kind to be tolerated in a fiduciary. See Fischer, 994 F.2d at 133 ("Put simply, when a plan administrator speaks, it must speak truthfully."). The majority defines the scope of ERISA's fiduciary duties so very narrowly as to strip them of any real meaning. See Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 110-11, 109 S.Ct. 948, 954, 103 L.Ed.2d 80 (1989) (in considering issues under ERISA that are not covered explicitly by the Act, a court should be guided by principles of trust law); Biggers v. Wittek, 4 F.3d 291, 294 (4th Cir.1993) (same). If ERISA's fiduciary duties are to be so impoverished that they permit an employer to hold out a promise of a contribution of $14.2 million to its employees in exchange for the employee's support of a management leveraged buy-out, and then, after the employees have given their support, permits the employer to renege by withdrawing the promise, then it is doubly necessary, in order that the goals of ERISA be effectuated, that the concepts of equitable estoppel and contract theory be incorporated into the ERISA federal common law. See Fischer, 994 F.2d at 136 (holding estoppel to be available as a federal common law remedy under ERISA to recover benefits which the plaintiffs did not receive as a result of the defendants' misleading statements).